**WILENCHIK & BARTNESS**
— A PROFESSIONAL CORPORATION —

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810   Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
Lawrence J. Felder, #019763
John D. Wilenchik, #029353
Brian J. Hembd, #029817
admin@wb-law.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Advocates for Individuals with Disabilities Foundation Incorporated,**<br><br>                            **Plaintiff;**<br>v.<br><br>**Golden Rule Properties LLC,**<br><br>                            **Defendant.** | Case No. 2:16-cv-02413-PHX-GMS<br><br>**PLAINTIFF'S REPLY TO RESPONSE TO ORDER TO SHOW CAUSE**<br><br>(**ORAL ARGUMENT REQUESTED**)<br><br>(Assigned to the Hon. G. Murray Snow) |

Plaintiff Advocates for American Individuals with Disabilities Foundation Incorporated ("Plaintiff," or "AID") and Peter Strojnik, Esq. and Fabian Zazueta, Esq. hereby file their Reply to the Court's Order to Show Cause (Dkt. 14). In conjunction herewith, Plaintiffs file a Notice of Erratum with respect to the "Exhibit A" to their prior filing.

There is an important point to be made in response to the Defendant's bilious attack on Plaintiff's allegedly "slapdash" litigation. Noncompliance with the ADA is, by all accounts, widespread, and has been for decades. *See* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006)(*cited by Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)). In large part, the reason for this is that the ADA does not provide enough incentives for plaintiffs to sue for relief,

unless they can do it in bulk. Bagenstos, 54 UCLA L. Rev. at 13.[1] Even then, serial ADA plaintiffs must deal with businesses that have privately-paid, well-funded (and equally contumelious) counsel, causing even greater expense. As a result, nearly every business in the Valley is not compliant with the ADA; and businesses adopt a "wait and see if anyone sues" attitude toward ADA compliance, relying solely on the high burden of filing and maintaining a federal lawsuit to protect them.

A disabled motorist who has trouble finding a parking spot should not have to file a federal lawsuit, seek an emergency injunction, and withstand 12(b)(6) motion practice (and unprofessional jabs by defense counsel) simply to find a spot. This is where AID comes in.

Simply put, the Defendant in this case is a strip mall that had no van-accessible sign in the parking lot. This has been a requirement of the ADA for nearly 26 years. The sign is supposed to help motorists find a parking spot that is wide enough for van/wheelchair access. The problem was easily identified, and is readily fixed.

AID sues businesses like this on the theory that where a business has one obvious violation, then there will be more, because it means that no-one ever inspected for ADA compliance. AID cannot fully inspect every business in the Valley for ADA compliance, and nobody else will either. AID sues because its lawsuits prompt businesses to hire inspectors to voluntarily to bring themselves into full compliance. If they do not, then they can and will be sued again, whether by AID or another serial ADA plaintiff. Clearly, this lawsuit succeeded in getting the Defendant to hire an inspector, and to allegedly fix its parking lot. It is important not to lose sight of this simple fact—that serial litigation *works*, and that it serves a valuable purpose

---

[1] *See also* the Ninth Circuit's Opinion in *Molski*: "We recognize that the unavailability of damages reduces or removes the incentive for most disabled persons who are injured by inaccessible places of public accommodation to bring suit under the ADA. As a result, most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled. District courts should not condemn such serial litigation as vexatious as a matter of course." 500 F.3d at 1062.

under the ADA.

The threshold for standing in a case such as this – especially, a civil rights case—simply cannot, and should not, be so onerous that it will never be filed. A simple violation demands a simple solution, and a correspondingly low barrier to seeking legal redress. If the problem is lack of a van-accessible parking sign, then the required standing should simply be a plaintiff who intends to look for a van-accessible parking space, and who is among the class of persons entitled to sue under the ADA. Plaintiff has alleged that its member, Ms. Puckett, intends to visit the Defendant's facility and look for a space; and that she has standing as the parent of a disabled child. Addressing the *Chapman*[2] analysis, her son's "particular disability" requires that he use a wheelchair, and so she needs to identify van-accessible, i.e. wheelchair-accessible spaces. (Van-accessible spaces are wider, to accommodate wheelchairs and other mobility devices.) Ms. Puckett's reasons for visiting the parking lot are legally irrelevant, and in fact visiting the lot merely to "test" for ADA compliance is entirely proper. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013)(finding that plaintiff's motivations for visiting the premises—which he sued for "a lack of designated disabled use parking spaces," in part—were legally irrelevant, and specifically finding that an intention to visit only for the purposes of checking whether the premises were ADA compliant was sufficient to confer standing).[3] *See also Ass'n For Disabled Americans, Inc. v. Reinfeld Anderson Family Ltd. Prt.*, No. 1:12-CV-23798, 2015 WL 1810536, at *4 (S.D. Fla. Apr. 21, 2015)(discussing the *Houston* case, and reaching the same conclusion); *Tandy v. City of Wichita*, 380 F.3d 1277, 1286–88

---

[2] *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011).

[3] "The substantive right conferred by the statute is to be free from disability discrimination in the enjoyment of the facility, regardless of [plaintiff's] motive for visiting the facility. [Plaintiff] suffered an injury when he allegedly encountered architectural barriers at the [Defendant] Supermarket—notwithstanding that he did so while testing for ADA compliance. Thus, the tester motive behind [Plaintiff's] past and future visits to the [Defendant] Supermarket does not preclude his having standing to sue for invasions of his legal rights…" *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013).

(10th Cir.2004)(holding that disabled passenger whose sole purpose in riding city buses was to test for ADA compliance had standing to seek prospective injunctive relief, and noting Congress' intent in Title II of the ADA to confer standing to the outer limits of Article III); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)(holding that, where statute conferred on all persons a legal right to truthful information about available housing, testers who had no intention of renting or purchasing a residence nevertheless had Article III standing to sue if they were denied the truthful information they sought).[4]

Defendant argues that Plaintiff cannot "possibly" be harmed by the lack of a van-accessible sign, and that it should be "apparent from the size-width of the parking space [on the ground]" whether the spot is accessible, etc. This is a question that Congress and the U.S. Department of Justice (which is tasked with promulgating ADA standards) already resolved in Plaintiff's favor, by the inclusion of a sign requirement in the ADA regulations. The task should not fall to this Court of speculating as to why, but the obvious reason is that marks on the ground may be obscured by vehicles, weather, or other debris. By including this requirement in the ADA, Congress and the USDOJ created a legal right, the invasion of which creates standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)("the injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing")(bracketing and ellipses omitted). Further, the Ninth Circuit has "held that 'obedience to the spirit of the ADA' does not excuse noncompliance with the ADAAG's [ADA standards] requirements. The ADAAG's requirements are as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman*, 631 F.3d at 945–46. The harm suffered by lack of a sign is also sufficiently concrete and particularized: very simply,

---

[4] The issue of "tester" standing is addressed in even more depth by Plaintiff's Reply to the Order to Show Cause regarding standing in the "Superstition Springs" matter, 2:16-cv-02298-PHX-GMS.

not having a sign makes it more difficult for the plaintiff to identify a van-accessible space. To hold otherwise would be to find that there can be no harm from violation of the ADAAG requirement, and in effect to repeal the law, which this Court may not be called upon to do.[5]

Defendant disputes whether Shannon Puckett is a member of AID, or possesses "indicia of membership." This is at best a dispute of fact that is not germane to the current proceedings. Ms. Puckett voluntarily agreed to become a member of AID and shares a clear commonality of interest in enforcing the ADA so that she can find parking for her child. Plaintiff organization exists entirely to support and serve persons like her and her child by litigating for ADA access. It is hard to see how she would not, or should not, qualify as a member of the organization, or what other "indicia" should be constitutionally required.

Further, there is an important reason why AID files as an association, and not merely on behalf of a single member. If Defendant were not questioning AID's standing to sue, then it would be questioning Ms. Puckett's. The Defendant could easily "ban" a single member like Ms. Puckett from their premises, and cite whatever pretextual reason they wanted in order to do so, enabling them to argue that she has no standing. For example, in *Ass'n For Disabled Americans v. Reinfeld Anderson Family Ltd. Prt.* (cited above),[6] the defendant medical office terminated its relationship with the disabled ADA plaintiff-patient, and then argued—successfully, at first—that the matter should be dismissed for lack of standing (because the defendant could not, or would not, return to the premises). After granting a Motion to Dismiss, the court reconsidered and vacated its own order, because among other reasons the plaintiff had filed on behalf of an association, and other members of the association could still have standing

---

[5] *See also Independent Living Resources v. Oregon Arena Corp.*, 982 F.Supp. 698, 762 (D.Or.1997)(stating how traditional standing principles lead to absurd results in the context of the ADA—an individual person might not be able to challenge the lack of visual fire alarms because there is no actual injury absent a fire).

[6] No. 1:12-CV-23798, 2015 WL 1810536, at *4.

5

to pursue the same claims. The clear benefit to filing "associational" claims is cases such as this – where, as everyone in the room knows, hundreds of disabled persons and/or their drivers could readily qualify as plaintiffs, merely by driving and/or planning to drive through the location and search for a spot to park – is to prevent such hypertechnical dismissals.

Defendant argues that because Ms. Puckett has not visited the premises, then she has no standing. (In fact, as of the filing of this brief, Ms. Puckett has visited the premises.) Defendant also erroneously argues that money damages are not available to Plaintiff. (The Court may award "monetary damages to aggrieved persons" in actions such as this that are filed under Article 8 of the Arizona Americans with Disabilities Act, or "AZDA." *See* A.R.S. §§ 41-1492.09(B)(2), 41-1492.08.) But for purposes of the present stage of the proceedings, it is sufficient to allege that Plaintiff's members intend to visit the accommodation at issue, something which any them can accomplish within minutes (and have). It is not necessary for all of them, or any of them, to have previously visited and actually encountered the barrier. There is nothing accomplished by requiring the plaintiff in a case such as this to have actually encountered the lack of a van-accessible sign. Nor is it beyond reason that Ms. Puckett, or any of Plaintiff's members, intends to go look for a van-accessible spot at the subject strip mall, which can occur within a matter of minutes (and has). *See Chapman*, 631 F.3d at 951 ("[t]he ability to pursue [Title III ADA injunctive] relief extends to 'any person who is being subjected to discrimination on the basis of disability in violation of this subchapter **or who has reasonable grounds for believing that such person is about to be subjected to discrimination**.' The statute provides that '[n]othing in this section shall require a person with a disability to engage in a futile gesture **if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions**.' Thus, the ADA specifically **does not require that the disabled individual personally encounter each architectural barrier as a predicate to seeking its removal**." (quoting and

citing 42 U.S.C. § 12188(a)(1))(emphasis added)). (This issue is discussed in greater depth by Plaintiff's Reply filed on this date in the "Price Company" matter, 2:16-cv-02141-PHX-GMS.)

### *Mootness*

(For the benefit of the Court, the argument on "mootness" contained herein is the same as that advanced in the "Price Company" matter, 2:16-cv-02141-PHX-GMS.)

Finally, Defendant raises mootness. This issue was not raised by the Court's Order to Show Cause, and Defendant has not separately moved to dismiss the claim on this basis. However, this is a recurring issue in ADA-access cases, and the reasons why are somewhat illuminative of the standing issues raised by the Court in the Order to Show Cause. First, a plaintiff cannot sue for ADA-access barriers in the first instance, unless the removal of the barrier "is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).[7] Therefore, barriers will often be fixed soon after the suit is filed. However, in order to seek their fees, ADA plaintiffs must pursue cases to a judgment on the merits—a problem that was caused directly by the United States Supreme Court's ruling in *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001)(rejecting the "catalyst theory" for recovering fees in ADA cases; i.e. the theory that plaintiffs can recover fees after the defendant voluntarily fixes the problem, solely because plaintiff was the "catalyst" for the change, and without litigating to a judgment on the merits). The *Buckhannon* case led directly to the common (and often criticized) practice by ADA serial plaintiffs such as Plaintiff of filing suit without notice, and *en masse*; because if the defendants fix the issue prior to suit being filed, then the suit may be rendered moot, depriving plaintiff of its claim to attorneys' fees. Bagenstos, 54 UCLA L. Rev. at

---

[7] "Title III of the ADA provides that '[n]o individual shall be discriminated against on the basis of disability' in places of public accommodation. 42 U.S.C. § 12182(a). Title III defines 'discrimination' as, among other things, a failure to remove 'barriers ... where such removal is readily achievable.' 42 U.S.C. § 12182(b)(2)(A)(iv). If removal of a barrier is not 'readily achievable,' a public accommodation must make its facilities available through 'alternative methods if such methods are readily available.' 42 U.S.C. § 12182(b)(2)(A)(v)." *Pickern v. Holiday Quality Foods Inc*., 293 F.3d 1133, 1135 (9th Cir. 2002).

7

6.[8] In *Buckhannon*, the Supreme Court expressly recognized this issue and indicated that the counterbalance to the problem should be twofold: one, "so long as the plaintiff has a cause of action for *damages*, a defendant's change in conduct will not moot the case." *Buckhannon*, 532 U.S. at 609 (emphasis added). In other words, the Plaintiff's claim for damages under the AZDA, however nominal, prevents the case from becoming moot. Second: "[e]ven then, it is not clear how often courts will find a case mooted," because "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (internal quotation marks omitted). This is crucially important in ADA cases, because as stated above, a plaintiff cannot sue in the first instance unless removal of the barrier is "readily achievable." If removal of a barrier is "readily achievable," then replacing the barrier will be "readily achievable" too. In the particular context of the ADA suits filed by Plaintiff, there is little to prevent defendants from removing signs, or repainting or relocating parking spaces (whether the motive is to free up parking, remove unattractive signs, or merely relocate/reuse the same signs in other places). It is, therefore, not "absolutely clear" that the violations could not reasonably be expected to recur. Given the dearth of remedies in the ADA to begin with, and the lack of incentives for ADA enforcement/compliance (which the Ninth Circuit remarked on in *Molski*),[9] this argument should be given special solicitude. Otherwise, there is no real motivation for private persons, much less dedicated groups like AID, to pursue ADA litigation, as it easier to simply avoid non-compliant

---

[8] "[Judges] have dismissed suits or refused to award attorneys' fees based on what they believe to be the abusive litigation practices of the plaintiffs and their counsel [in ADA cases]—in particular, the practice of bringing suits against large numbers of businesses, often without providing notice to the defendants before heading for court….The failure to provide notice, too, is a natural result of the limitations on remedies under the statute. If plaintiffs' attorneys provided presuit notice, businesses could easily render cases nonjusticiable—and deprive the attorneys of a fee recovery—simply by making their premises accessible before or during the pendency of litigation." Bagenstos, 54 UCLA L. Rev. at 6.

[9] See footnote one, above.

businesses. And any business, when given the choice between voluntarily complying with the ADA, or waiting for somebody to bother to file a federal lawsuit—and with no repercussions for taking the "wait and see" approach—will always choose the latter. What is already a "bad" situation in terms of widespread ADA noncompliance will only worsen, completely frustrating Congress's intent in passing the Act.

### *The Court Should Not Sanction AID and/or its Counsel* [10]

As stated in Plaintiff's prior response, neither it nor its counsel acted in bad faith by bringing federal claims, and in fact they were professionally obligated to do so. In short, Defendant accuses Plaintiff of "bad faith" because Defendant—who clearly sought to use the removal procedure for no reason other than to force Plaintiff to drop its federal claims—preemptively demanded that Plaintiff drop the claims *before* Defendant actually removed the case to federal court. Plaintiff refused, on the grounds that Plaintiff fully intended to pursue its federal claims in state court until Defendant actually filed for removal. There is nothing in the Rules that obligates Plaintiff or its counsel to believe or submit to the Defendant's threats to remove the case, and Plaintiff was perfectly within its rights to wait for the Defendant to actually do so. In the parlance of the *Baddie*[11] case, Plaintiff made its "offer" to litigate in state court by filing the action, and Defendant did not "reject" the offer until it actually filed for removal. ("The defendant is not obligated to remove; rather, *he has the choice* either to submit to state court resolution of his claims, or to assert his right to a federal forum. If the defendant

---

[10] Defendant's reference to actions or arguments of the Arizona Attorney General have absolutely no persuasive authority whatsoever and are inappropriate. In fact, the Office of the Attorney General and the Defendants' attorneys in this case have had at least one meeting in person, multiple communications, and are merely parroting each other's arguments in briefs.

Also, any decision by Judge Tuchi of this court to award fees and costs carries no binding authority, and should carry no persuasive authority, where there is no evidence that the arguments presented here were presented to or considered by Judge Tuchi. (Undersigned counsel made no appearance in such action.)

[11] *Baddie v. Berkeley Farms, Inc.*, 64 F.3d 487, 491 (9th Cir. 1995).

*rejects* the plaintiff's offer to litigate in state court *and removes the action…*" *Baddie v. Berkeley Farms, Inc.*, 64 F.3d 487, 491 (9th Cir. 1995)(emphasis added)). The Defendant's act of merely threatening to remove the case was not a true "rejection," because for all Plaintiff knew, Defendant could have ultimately decided not to incur the cost of removal, even after making the threat. There is no evidence that Plaintiff intended to make Defendant undergo the removal-remand procedure in "bad faith," anymore than Defendant intended to make Plaintiff undergo the removal-remand procedure in bad faith, and for the sole purpose of compelling Plaintiff to drop its federal claims. This is simply the way that rules of civil procedure work: Plaintiff bears the cost of bringing its case to state court, which it may feel has some advantage; and Defendant bears the cost of bringing the case to federal court, which it may feel has some advantage. There is no particularly "noble" purpose to either act. This is merely the rules of civil procedure, which are designed to equally protect the rights and expectations of both parties. *Baddie* stands for the proposition that a plaintiff has as much right to bring its federal claims in state court, as the defendant does to use the removal-remand procedure to force the plaintiff to drop them. Neither goal is more worthy, or more in "bad faith," than the other. And the rules clearly provide that plaintiff should bear the cost of the former, while the defendant must bear the cost of the latter. To compel Plaintiff to bear the Defendant's fees and costs would be to let the Defendant have its cake and eat it too, by allowing Defendant to use the remand-removal procedure solely to force Plaintiff to drop its claims, and then also make Plaintiff pay for it. This is simply not how the rules are structured; and if a Defendant wants to abuse the remand-removal procedure solely to force Plaintiff to drop its claims, then it should bear the cost of it just the same. A contrary rule would demand that the court arbitrarily decide that one party or the other acted in bad faith merely by invoking and following established court rules, which achieves no purpose.

## **CONCLUSION**

For all the foregoing reasons, 1) Plaintiffs have standing, and 2) Plaintiffs and their counsel should not be sanctioned.

10

**RESPECTFULLY SUBMITTED** this September 22, 2016.

**WILENCHIK & BARTNESS, P.C.**

*/s/ John D. Wilenchik*
Dennis I. Wilenchik, Esq.
Lawrence J. Felder, Esq.
John D. Wilenchik, Esq.
Brian J. Hembd, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com
*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2016, I electronically transmitted the attached document using the CM/ECF system for filing, and which will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

*/s/ Christine M. Ferreira*

11